# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1974

_____

In re: Charter Communications, Inc.,    *
Securities Litigation,    *
------------------------------------------------    *
   *
Stoneridge Investment Partners, LLS,    *
   *   Appeal from the United States
      Plaintiff - Appellant,    *   District Court for the
   *   Eastern District of Missouri.
      v.    *
   *
Scientific-Atlanta, Inc; Motorola, Inc.,    *
   *
      Defendants - Appellees.    *
   *

_____

Submitted:  December 12, 2005
Filed:  April 11, 2006

_____

Before LOKEN, Chief Judge, WOLLMAN and RILEY, Circuit Judges.

_____

LOKEN, Chief Judge.

This is a securities fraud class action by Stoneridge Investment Partners on behalf of those who purchased Charter Communications, Inc., stock between November 8, 1999 and August 16, 2002.  Plaintiffs alleged that Charter -- one of the nation's largest cable television providers -- engaged in a "pervasive and continuous fraudulent scheme intended to artificially boost the Company's reported financial

results" by deliberately delaying the disconnecting of customers no longer paying their bills, improperly capitalizing labor costs, and entering into sham transactions with two equipment vendors that improperly inflated Charter's reported operating revenues and cash flow. Named as defendants were Charter; ten Charter executives during all or part of the class period; Arthur Andersen, LLP, Charter's independent auditor during the class period; and the two equipment vendors, Scientific-Atlanta, Inc., and Motorola, Inc. (collectively, "the Vendors").

Relying on Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), the district court[1] granted the Vendors' motion to dismiss plaintiffs' claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's implementing regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5. The court then denied plaintiffs' motions to reconsider the dismissal and to grant leave to file an amended complaint. Stoneridge appeals. We have jurisdiction because the district court entered a separate final judgment under Rule 54(b) of the Federal Rules of Civil Procedure. We affirm.

**I.**

1. The Standard of Review. Plaintiffs' sixty-eight-page complaint is factually detailed, as it must be to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b). Our *de novo* review accepts the facts as alleged in the complaint and draws all reasonable inferences in favor of Stoneridge in deciding whether the complaint satisfied these pleading requirements. See In re Navarre Corp. Sec. Litig., 299 F.3d 735, 740-48 (8th Cir. 2002).

---

[1]The HONORABLE CHARLES A. SHAW, United States District Judge for the Eastern District of Missouri.

2. The Scheme Alleged. At the time in question, Charter delivered cable services through set-top boxes installed on customers' TV sets. Charter purchased the set-top boxes from third-parties, including the Vendors. In August 2000, although Charter had firm contracts with the Vendors to purchase set-top boxes at a set price sufficient for its present needs, Charter agreed to pay the Vendors an additional $20 per set-top box in exchange for the Vendors returning the additional payments to Charter in the form of advertising fees.

Plaintiffs alleged that these were sham or wash transactions with no economic substance, contrived to inflate Charter's operating cash flow by some $17,000,000 in the fourth quarter of 2000 in order to meet the revenue and operating cash flow expectations of Wall Street analysts. Charter accomplished the deception with fraudulent accounting by improperly capitalizing the increased equipment expenses while treating the returned advertising fees as immediate revenue. Plaintiffs alleged that the Vendors entered into these sham transactions knowing that Charter intended to account for them improperly and that analysts would rely on the inflated revenues and operating cash flow in making stock recommendations. Plaintiffs did not allege that the Vendors played any role in preparing or disseminating the fraudulent financial statements and press releases through which Charter published its deception to analysts and investors.

3. The Governing Law. Section 10(b) makes it unlawful, directly or indirectly, "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly . . . (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) [t]o

engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In Central Bank, the Supreme Court confirmed that § 10(b) prohibits only "manipulative or deceptive" devices or contrivances, and that private plaintiffs "may not bring a [Rule] 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)." 511 U.S. at 173. In earlier cases, the Court held that "deceptive" conduct involves either a misstatement or a failure to disclose by one who has a duty to disclose. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 474-75 & n.15 (1977); Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 153-54 (1972); accord United States v. O'Hagan, 521 U.S. 642, 653-655 (1997). "Manipulative," as used in the securities context, is a "term of art"and refers to illegal trading practices such as "wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe, 430 U.S. at 476-77, citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 & n.21 (1976), and Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 43 (1977).

Based upon these earlier cases and the text and legislative history of the 1934 Act, the Court in Central Bank rejected the contrary position of the SEC and held that Rule 10b-5 does not reach those who only aid or abet a violation of § 10(b):

> As in earlier cases considering conduct prohibited by § 10(b), we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. . . . The proscription does not include giving aid to a person who commits a manipulative or deceptive act.

511 U.S. at 177. However, the concluding section of the <u>Central Bank</u> majority opinion added an important caveat:

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met.

<u>Id</u>. at 191 (emphasis in original). This is one of many cases that have tested the boundaries of that caveat.

4. <u>The District Court's Decision.</u> In a thorough Memorandum and Order, the district court concluded that <u>Central Bank</u>, as uniformly applied by a number of our sister circuits, precludes plaintiffs' claims against the Vendors as nothing more than claims they aided and abetted Charter in committing § 10(b) violations:

> The Court concludes plaintiffs' claims against [the Vendors] are claims for aiding and abetting. Plaintiffs do not assert that [the Vendors] made any statement, omission or action at issue or that plaintiffs relied on any statement, omission or action made by either of them. Plaintiffs also do not allege that [the Vendors] were responsible for, or were involved with the preparation of Charter's allegedly false or misleading financial statements; Charter's allegedly improper internal accounting practices; or the allegedly false or misleading public statements made by Charter and its former executives. Plaintiffs also do not allege that any of the allegedly misleading statements listed in the amended complaint were made, seen, or reviewed by [the Vendors]. Instead, plaintiffs contend that [the Vendors] are liable to Charter's investors on the basis that they engaged in a business transaction that Charter purportedly improperly accounted for.

> Nor can [the Vendors] be held liable for any purported omissions as plaintiffs have not alleged that [the Vendors] had any duty to Charter's investors. . . . The Court can find no precedent for the conclusion that business partners, such as [the Vendors], made false and misleading statements by virtue of engaging in a business enterprise with a company such as Charter, the entity purported to have made the statements at issue.

Plaintiffs then filed motions for reconsideration and for leave to amend their complaint, citing additional cases and pleading additional facts. The district court denied both motions, concluding that the additional citations were unpersuasive and the proposed amendment would be futile because it merely reiterated the prior allegations with additional particularity.

## II.

On appeal, Stoneridge argues that plaintiffs properly alleged a *primary* violation of the securities laws within the meaning of Central Bank because the Vendors violated Rule 10b-5(a) and (c) by participating in a "scheme or artifice to defraud" and by engaging in a "course of business which operates . . . as a fraud or deceit." The argument emphasizes that Rule 10b-5(a) and (c) are broadly worded and, unlike Rule 10b-5(b), do not require proof of a fraudulent misrepresentation or failure to disclose. The argument depends on the assertion that Central Bank's analysis did not affect the scope of primary liability under subparts (a) and (c), relying primarily on a recent district court decision, In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 492-503 (S.D.N.Y. 2005).

Like the district court, we reject Stoneridge's narrow interpretation of Central Bank. We conclude that Central Bank and the earlier cases on which it relied stand for three governing principles: (1) The Court's categorical declaration that a private plaintiff "may not bring a 10b-5 suit against a defendant for acts not prohibited by the

text of § 10(b)," 511 U.S. at 173, included claims under Rule 10b-5(a) and (c), as well as Rule 10b-5(b). (2) A device or contrivance is not "deceptive," within the meaning of § 10(b), absent some misstatement or a failure to disclose by one who has a duty to disclose. See Santa Fe, 430 U.S. at 474-75. (3) The term "manipulative" in § 10(b) has the limited contextual meaning ascribed in Santa Fe, id. at 476-77.[2] Thus, any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5. Accord Fidel v. Farley, 392 F.3d 220, 235 (6th Cir. 2004); Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194,1204-06 (11th Cir. 2001); Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998), cert. denied, 525 U.S. 1104 (1999); Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1225-27 (10th Cir. 1996); In re Software Toolworks, Inc. Sec. Litig., 50 F.3d 615, 628 n.3 (9th Cir. 1994); In re Dynegy, Inc. Sec. Litig., 339 F. Supp. 2d 804, 914-16 (S.D. Tex. 2004); In re Homestore.com, Inc. Sec. Litig., 252 F. Supp. 2d 1018, 1040-41 (C.D. Cal. 2003).

In this case, the focus of plaintiffs' § 10(b) and Rule 10b-5 claims was deception -- they alleged a "continuous course of conduct" in which Charter allegedly "made and/or failed to correct public representations which were or had become materially false and misleading regarding Charter's financial results and operations." Indeed, eighteen pages of the amended complaint alleged in fifty detailed paragraphs the fraudulent financial reports and press releases published by Charter during the class period. However, neither Motorola nor Scientific-Atlanta was alleged to have

---

[2] We agree with then-district judge Patrick Higginbotham that the Supreme Court in Santa Fe intended to limit § 10(b) claims of unlawful manipulation (as opposed to deception) to "transactions in the [securities] marketplace, the effects of which were to prevent the market price from accurately reflecting the market's unimpeded judgment of the stock's value." Hundahl v. United Benefit Life Ins. Co., 465 F. Supp. 1349, 1360 (N.D. Tex. 1979).

engaged in any such deceptive act. They did not issue any misstatement relied upon by the investing public, nor were they under a duty to Charter investors and analysts to disclose information useful in evaluating Charter's true financial condition. None of the alleged financial misrepresentations by Charter was made by or even with the approval of the Vendors. Accordingly, the district court properly dismissed the claims against the Vendors as nothing more than claims, barred by Central Bank, that the Vendors knowingly aided and abetted the Charter defendants in deceiving the investor plaintiffs.

Like the district court and the court in In re Homestore.com, 252 F. Supp. 2d at 1041, we are aware of no case imposing § 10(b) or Rule 10b-5 liability on a business that entered into an arm's length non-securities transaction with an entity that then used the transaction to publish false and misleading statements to its investors and analysts. The point is significant. To impose liability for securities fraud on one party to an arm's length business transaction in goods or services other than securities because that party knew or should have known that the other party would use the transaction to mislead investors in its stock would introduce potentially far-reaching duties and uncertainties for those engaged in day-to-day business dealings. Decisions of this magnitude should be made by Congress.

## III.

Finally, Stoneridge argues that the district court abused its discretion in denying plaintiffs' post-dismissal motions to reconsider the dismissal order and to grant plaintiffs leave to amend the complaint. A district court has broad discretion to reconsider an order granting dismissal or summary judgment, but "[a] motion to alter or amend judgment cannot be used to raise arguments which could have been raised prior to the issuance of judgment." Hagerman v. Yukon Energy Corp. 839 F.2d 407, 414 (8th Cir.), cert. denied, 488 U.S. 820 (1988). Here, plaintiffs argued that the district court overlooked or misapplied prior decisions from district courts in other

circuits. The district court briefly reviewed those cases and concluded it "is not inclined to reach a different result." Denial of the motion to reconsider on this ground was not an abuse of discretion. Indeed, we agree with the court's analysis of those non-controlling cases.

The district court denied the post-dismissal motion to amend because the proposed pleading would be futile -- the additional allegations as to the Vendors' role and knowledge set forth in the proposed amended complaint did not cure the flaws in plaintiffs' § 10(b) theory. Denial of a motion to amend on this ground, particularly a motion filed after the district court's final ruling, is not an abuse of discretion. See, e.g., Grandson v. Univ. of Minn., 272 F.3d 568, 575 (8th Cir. 2001), cert. denied, 535 U.S. 1054 (2002).

The Final Judgment of the district court dated February 15, 2005, is affirmed.

_____