Miguel J. **LARACH** and Great American Corporation, Plaintiff,

v.

**STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED and Stanchart Securities International, Inc., Defendants.**

Case No. 09–21178–CIV.

United States District Court, S.D. Florida, Miami Division.

July 2, 2010.

Carlos Francisco Concepcion, Concepcion & Associates, Miami, FL, Ricardo Hugo Puente, Scott Allen Burr, Concepcion Sexton & Martinez, Coral Gables, FL, for Plaintiff.

Lacey DeLynne Diggs, Ricardo A. Gonzalez, Greenberg Traurig, Miami, FL, for Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

FEDERICO A. MORENO, Chief Judge.

Plaintiffs Miguel Larach and Great American Corporation allege that Defendants pledged the assets of the accounts they hold with Defendants' banks as security on loans made to Miguel Larach's sons without Plaintiffs' authorization. Defendants argue in opposition that Plaintiffs executed valid pledges that authorized Defendants' actions and that Plaintiffs are

obligated to repay the losses sustained when Larach's sons defaulted on the loans. Defendants have frozen Plaintiffs' accounts and have seized their assets. Plaintiffs filed an eight-count Second Amended Complaint and allege that Defendants are civilly liable under various theories, including violations of the securities laws, violations of the Florida Deceptive and Unfair Trade Practices Act, breach of their contractual obligations, and conversion. Defendants move to dismiss each count of the Second Amended Complaint.

THE COURT has considered the motion to dismiss, response, reply, supplemental briefing, and the other pertinent portions of the record. The Court finds that there is no private right of action to enforce Section 8 of the Securities Exchange Act of 1934, and therefore, Defendants' motion to dismiss is granted as to Count I of the Second Amended Complaint. Because Plaintiffs sufficiently plead the remaining counts of the Second Amended Complaint to state a claim upon which relief can be granted, Defendants' motion to dismiss as to Counts II–VIII is denied, with leave to renew as a motion for summary judgment.

## I. FACTUAL BACKGROUND

Plaintiff Miguel Larach, a citizen of Honduras, is the Chief Executive Officer, President, and sole shareholder of Plaintiff Great American Corporation ("Great American"). Miguel Larach has two sons, Oscar and Ruben Larach, who are not parties to this litigation. Oscar Larach is the owner of a beverage distribution company in Honduras called "Inlaza." Ruben Larach is the owner of an exporting company in Honduras called "Distribudora RF5."

Defendant Standard Chartered Bank International (Americas) Limited ("Standard Chartered") is a corporation with its principal place of business in Miami, Florida. Standard Chartered was formerly known as American Express Bank International. Defendant Stanchart Securities International ("Stanchart") is a registered broker-dealer with its principal place of business in Miami, Florida. Both Defendants are U.S. subsidiaries of a large international bank that is incorporated in the United Kingdom.

Plaintiff Miguel Larach holds two accounts in the name of Plaintiff Great American with Standard Chartered. Non-party William Solorzano was assigned to manage the accounts. Both of Miguel Larach's accounts encompass a money market account, mutual funds, stocks, and bonds. Additionally, both of Miguel Larach's sons, Oscar and Ruben, hold accounts with Standard Chartered in the name of their respective companies, Inlaza and Distribudora RF5. All of the accounts have held multiple millions of dollars worth of assets at one point in time.

During the period of 2002 through 2008, Standard Chartered made over $4 million dollars in loans to the two sons, Oscar and Ruben Larach, and their respective companies. Plaintiff Miguel Larach agreed to fund personally a $1.5 million loan to Oscar's company, Inlaza. Miguel Larach agreed to pledge the assets of his own Great American accounts as security on the loan with the condition that Inlaza had the primary responsibility to repay the loan. Later, Miguel Larach also orally agreed to authorize an overdraft loan of $200,000 to Oscar's company, Inlaza. Aside from the loans for $1.5 million and $200,000 made to Oscar's company Inlaza, Miguel Larach had no knowledge of any of the other loans Standard Chartered made to Oscar or Ruben.

Oscar and Ruben's companies defaulted on several of their loans from Standard Chartered. In February 2009, Defendant Standard Chartered informed Plaintiff that he was responsible for repayment of

four loans to Ruben's company, Distribudora RF5, in the total amount of approximately $1.85 million and was responsible for repayment of three loans to Oscar's company, Inlaza, in the total amount of approximately $2.2 million. Defendants claim that Plaintiff Miguel Larach is liable for the defaulted loans made to his son's companies because he signed a pledge agreement to secure the loans with the assets of the Great American accounts. In total, Defendants claim that Plaintiffs are obligated to pay them approximately $4.05 million. Defendants have frozen and seized all funds in Plaintiffs' accounts.

Plaintiffs claim to have no knowledge of any of the loans other than the one to Inlaza in the amount of $1.5 million, for which Plaintiff Larach pledged Great American assets as security, and the $200,000 overdraft to Inlaza. Plaintiffs claim that Defendants are unlawfully seeking to collect from Plaintiffs on loans totaling over $2.3 million made to the two sons' companies. Plaintiffs allege that Defendants have wrongfully seized more than $1.9 million in assets in the Great American accounts. Plaintiffs argue that the pledges that Defendants have from Plaintiffs are forgeries that were created to hold Plaintiffs responsible to cover losses Defendants sustained as a result of the defaulted loans to Oscar and Ruben Larach and their companies.

Plaintiffs' Second Amended Complaint (D.E. No. 18) alleges eight separate counts against Defendants: (Count I) violations of Section 8 of the Securities Exchange Act, (Count II) violations of the Florida Deceptive and Unfair Trade Practices Act, (Count III) breach of contract, (Count IV) breach of duty of good faith and fair dealing, (Count V) conversion, (Count VI) common law fraud, (Count VII) breach of fiduciary duties, and (Count VIII) negligence/negligent servicing. Defendants filed a Motion to Dismiss (D.E.

No. 24) in which they move to dismiss each count of the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD OF REVIEW FOR A RULE 12(B)(6) MOTION TO DISMISS

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) should be granted if the allegations in the complaint fail "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A Rule 12(b)(6) motion tests the formal sufficiency of the allegations of claims for relief. The dismissal of a complaint is warranted "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1308 (11th Cir.2006).

When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir.1986). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). Those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). In short, the complaint cannot merely allege misconduct, but must demonstrate that it is plausible that the pleader is entitled to relief. *See id.* at 1950.

## III. LEGAL ANALYSIS

### A. Count I—Violations of Section 8 of the Securities Exchange Act

■ Count I of the Second Amended Complaint alleges violations of Section 8 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78h (1996), and 17 C.F.R. 240.8c–1(a)(3). Section 8 of the Exchange Act regulates the hypothecation of customers' securities by a "broker or dealer."[1] 15 U.S.C. § 78h; *see generally* Louis Loss & Joel Seligman, 7 *Securities Regulation* 3176–86 (3d ed. 2003). Section 8(c) of the Act provides:

> It shall be unlawful for any registered broker or dealer, member of a national securities exchange, or broker or dealer who transacts a business in securities through the medium of any member of a national securities exchange, directly or indirectly—
>
> (a) In contravention of such rules and regulations as the Commission shall prescribe for the protection of investors to hypothecate or arrange for the hypothecation of any securities carried for the account of any customer under circumstances (1) that will permit the commingling of his securities without his written consent with the securities of any other customer, (2) that will permit such securities to be commingled with the securities of any person other than a bona fide customer, or (3) that will permit such securities to be hypothecated, or subjected to any lien or claim of the pledgee, for a sum in excess of the aggregate indebtedness of such customers in respect of such securities.
>
> (b) To lend or arrange for the lending of any securities carried for the account of any customer without the written consent of such customer or in contravention of such rules and regulations as the

Commission shall prescribe for the protection of investors.

15 U.S.C. § 78h. Plaintiffs allege that Defendants violated this federal statute by subjecting the securities in their accounts to liens in excess of their aggregate indebtedness and having done so without Plaintiffs' written consent.

■ Various sections of the Exchange Act, as well as sections of the Securities Act of 1933, 15 U.S.C. §§ 78a-nn, provide for private rights of action, while other sections are limited to enforcement by criminal actions brought by the United States or civil enforcement actions brought by the Securities and Exchange Commission ("SEC"). *See* Thomas L. Hazen, *The Law of Securities Regulation* § 1.8 (6th ed. 2009). For a civil plaintiff to sue based on a violation of a section of the securities laws, there must be a private right of action associated with that section. It is not enough for a plaintiff to allege simply that the requirements of the section or rule have been violated. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 569, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Private rights of action are either expressly contained in the statutes or have been recognized by the courts as implied in the statutes. The Supreme Court has, however, declined to recognize private rights of action to enforce sections of the Exchange Act when it has found that Congress intended otherwise. *See, e.g., id.* at 569, 99 S.Ct. 2479 (holding that there is no private right of action to enforce violations of Section 17(a) of the Exchange Act).

The parties concede that there is no express private of action in Section 8 of the Exchange Act. Therefore, for Plaintiffs' Count I to proceed in the instant litigation, there must exist an implied private right of

---

1. Black's Law Dictionary defines "hypothecation" as: "The pledging of something as secu-
rity without delivery of title or possession." *Black's Law Dictionary* 759 (8th ed. 2004).

action to enforce Section 8 of the Exchange Act. There is no reported case that has determined whether there is a private right of action to enforce Section 8. *See generally First Fed. Savs. & Loan Assoc. of Pitt. v. Oppenheim, Appel, Dixon & Co.,* 629 F.Supp. 427, 442 n. 13 (S.D.N.Y.1986) (noting that there has been some doubt as to whether a private right of action exists under Section 8); *Ferreri v. Fox, Rothschild, O'Brien & Frankel,* 690 F.Supp. 400, 403 n. 3 (E.D.Pa.1988) (stating that there are no private rights of action under Sections 6 and 7 of the Exchange Act and expressing doubt as to the existence of a private right of action under Section 8); Hazen, *supra,* at 186 (providing a table showing the sections of the Exchange Act that contain a private right of action and omitting Section 8). Additionally, most reported cases involving Section 8 are enforcement actions brought by the Government or the SEC. In ruling on this Motion to Dismiss, the Court must determine whether an implied private right of action exists under Section 8 of the Exchange Act.

### 1. The Supreme Court's Implied Private Right of Action Jurisprudence

Prior to 1975, the U.S. Supreme Court operated under a relatively expansive view of the recognition of implied private rights of action in federal statutes, as exemplified in the case of *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), however, the Supreme Court began to reign in the standard of review for recognizing private rights of action. *Cort* enumerated four factors that a court should consider when ruling on whether a statute includes an implied private right of action: (1) whether the statute was enacted for the benefit of a special class of which the plaintiff is a member; (2) whether the legislative history shows an indication of congressional intent to create a private remedy; (3)

whether implication of a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) whether implying a federal remedy is inappropriate because the subject matter involves an area traditionally within the province of the states. *See Cannon v. Univ. of Chi.,* 441 U.S. 677, 689–709, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (interpreting *Cort,* 422 U.S. at 80–85, 95 S.Ct. 2080).

*Touche Ross & Company v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), effectively supplanted the *Cort* four-factor approach and narrowed the standard of review down to one "central inquiry" of determining congressional intent. The question is one of statutory interpretation, and a court's "task is limited solely to determining whether Congress intended to create [a] private right of action." *Touche Ross,* 442 U.S. at 568, 99 S.Ct. 2479. Since *Touche Ross,* the Supreme Court has been cautious in recognizing private rights of action and most often finds against implying a private right of action in federal statutes. *See* Richard H. Fallon, Jr. et al., *Hart and Wechsler's The Federal Courts and the Federal System* 782 (5th ed. 2003).

In the more recent cases of *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), and *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008), the Supreme Court reaffirmed its restrictive approach initiated in *Touche Ross* that focuses only on congressional intent and explained some of the policy concerns that should encourage courts to be cautious in recognizing implied private rights of action. The Supreme Court emphasized that without congressional intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a

policy matter, or how compatible with the statute." *Sandoval,* 532 U.S. at 286–87, 121 S.Ct. 1511. "In the absence of congressional intent the Judiciary's recognition of an implied private right of action 'necessarily extends its authority to embrace a dispute Congress has not assigned it to resolve.'" *Stoneridge,* 552 U.S. at 164, 128 S.Ct. 761 (quoting *Am. Fire & Cas. Co. v. Finn,* 341 U.S. 6, 17, 71 S.Ct. 534, 95 L.Ed. 702 (1951)). The Supreme Court sought to clarify that it is the role of Congress to provide private parties with the right to enforce federal statutes through private litigation, and the courts would be encroaching on the role of the Legislative Branch if they imply private rights of action absent a clear indication of congressional intent. The Supreme Court has signaled that it intends to continue this restrictive approach to the recognition of implied rights of action from hence forward. *See Sandoval,* 532 U.S. at 287, 121 S.Ct. 1511 (holding that no implied private right of action exists under Section 602 of Title VI of the Civil Rights Act of 1964 and stating, "Having sworn off the habit of venturing beyond Congress's intent, we will not accept respondents' invitation to have one last drink").

The issue of implied private rights of action has been especially important in the area of securities law. Several scattered sections of the Exchange Act have been found to contain implied private rights of action. The first implied right of action recognized in the area of securities law also continues to be one of the most utilized—Section 10(b), the anti-fraud provision of the Exchange Act. *See Kardon v. Nat. Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa. 1946). An implied right of action was first recognized in Section 10(b) in 1946 by a federal district court in Pennsylvania in *Kardon v. National Gypsum Co.,* 69 F.Supp. at 514–15. Other federal courts followed *Kardon's* lead, and the Section 10(b) implied private right of action was

widely recognized by 1971, when the Supreme Court likewise recognized that implied right of action in *Superintendent of Ins. of the State of New York v. Bankers Life and Casualty Company,* 404 U.S. 6, 13, n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). After an initial expansion of implied private rights of action in securities law, the Supreme Court began to reign in the courts and restricted the recognition of new rights in this area, just as it had in other areas of law. For example, in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 191–92, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Court held that no implied private right of action existed to sue aiders and abetters for securities fraud under Section 10(b). The Supreme Court has continued the trend of restricting the recognition of private rights of action in the area of securities law. *See Stoneridge,* 552 U.S. at 167, 128 S.Ct. 761 (holding that the implied right of action of Section 10(b) does not include "scheme liability").

### 2. Whether an Implied Right of Action Exists in Section 8 of the Securities Exchange Act

 As explained above, the "central inquiry" in determining if an implied right of action exists in a federal statute is whether Congress intended there to be a private right of action. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). "The bar for showing legislative intent is high. 'Congressional intent to create a private right of action will not be presumed. There must be clear evidence of Congress's intent to create a cause of action.'" *McDonald v. Southern Farm Bureau Life Ins. Co.,* 291 F.3d 718, 723 (11th Cir.2002) (quoting *Baggett v. First Nat'l Bank of Gainesville,* 117 F.3d 1342, 1345 (11th Cir. 1997)). There are three main considerations that are relevant to the examination

of legislative intent: "[f]irst and foremost, we look to the statutory text for rights-creating language," "[s]econd, we examine the statutory structure within which the provision in question is embedded," and third, we consider "the legislative history and context within which a statute was passed." *Love v. Delta Air Lines,* 310 F.3d 1347, 1352–53 (11th Cir.2002) (interpreting *Alexander v. Sandoval,* 532 U.S. 275, 288, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)) (quotations omitted).

First, the Court must begin its analysis of congressional intent with the language of the statute itself, focusing on the text and structure of Section 8(c) of the Exchange Act. *See Sandoval,* 532 U.S. at 288, 121 S.Ct. 1511; *see also Love,* 310 F.3d at 1352. The statute prohibits brokers or dealers from pledging their customers' securities against loans in a way that would allow commingling of the securities with securities of that broker or dealer or with securities owned by other customers. *See* 15 U.S.C. § 78h. Further, Section 8 prohibits brokers or dealers from hypothecating customer securities for an amount in excess of the aggregate customer indebtedness. *See id.* Additionally, the statute requires written consent of the customer for securities held by the broker or dealer before the broker or dealer can lend those securities to others. *See id.*

■ The text of the statute focuses on regulating the actions of brokers and dealers. All of the regulations and prohibitions instruct how brokers can lend the securities of their customers and what required steps they must take. The statute's focus on regulating the actions of the brokers shows that it was not intended to create rights for the customers who put their securities in the hands of their brokers, which is the position of Plaintiffs here. "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to

confer rights on a particular class of persons.'" *Sandoval,* 532 U.S. at 289, 121 S.Ct. 1511 (quoting *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981)). While the statute does mention that the brokers shall not violate the rules that the SEC shall prescribe "for the protection of investors," it is clear the statute is focused on regulating the brokers themselves, not on protecting the investing customers. There is no "unmistakable focus on the benefitted class" here, *see Sierra Club,* 451 U.S. at 294, 101 S.Ct. 1775, as the focus is on the proscription of certain activities of the brokers and dealers. The text of Section 8 focuses on regulating the brokers, and the lack of any rights-creating language is strong evidence that there was no congressional intent to create a private right of action on behalf of investors.

Second, the Court must examine the statutory structure of Section 8 and the provisions surrounding it to discern congressional intent. *See Love,* 310 F.3d at 1353. "If that statutory structure provides a discernible enforcement mechanism, *Sandoval* teaches that we ought not imply a private right of action...." *Id.* The structure of Section 8, however, does not reveal a discernible enforcement mechanism. Unlike other sections of the Exchange Act, Section 8 neither instructs agencies to promulgate rules and regulations, nor does it contain an express private right of action. Section 8 has been enforced occasionally by government enforcement action, *see, e.g., U.S. v. Schwartz,* 464 F.2d 499 (2nd Cir.1972), but the language of the Section itself does not expressly contain a specific enforcement provision.

■ Third, the Court must consider the legislative history of Section 8 and the context within which the Exchange Act was passed. *See Love,* 310 F.3d at 1353.

Congress was prompted by President Franklin Delano Roosevelt to begin work on the Exchange Act in response to the stock market crash of 1929, which was one of the causes of the Great Depression. *See* S. Rep. 73–792, at 2 (1934). Congress was concerned that unregulated and "feverish speculation" had led to an excessive amount of credit being pumped into the stock market, which led to the crash when brokers' loans were called. *See id.* at 3. The overall purpose of the Exchange Act was to prevent the excessive speculation that led to the stock market crash and the Great Depression by limiting the extension of credit in securities transactions. *See id.* Congress was concerned with stabilizing the securities market so as to protect the national economy.

 There is scant legislative history regarding Section 8 of the Exchange Act. Where Section 8 is located in the overall statutory structure of the Exchange Act is informative, however. Naturally, Section 8 follows Section 7, which establishes required margin requirements for securities dealers. *See* 15 U.S.C. § 78g. These two sections have a common purpose of controlling the amount of credit used in securities speculation by brokers. *See* H.R.Rep. No. 73–1383, at 7 (1934) (grouping the two sections that would later be enacted as Sections 7 and 8 of the Exchange Act under the same category of "Control of Credits"). Both sections ensure that brokers do not overextend the securities they control as collateral, so as to reduce risk of instability in the stock market. There is no implied private right of action to enforce Section 7. *See Bennett v. U.S. Trust Co. of N.Y.* 770 F.2d 308, 312 (2d Cir.1985) (citing cases from five other circuit court of appeals in agreement).

Further, the legislative history of Section 7 reveals that its "main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market...." *See* H.R.Rep. No. 73–1383, at 8 (1934). The House of Representatives' report clearly stated that the section that became Section 7 "is not to increase the safety of security loans for lenders." *Id.* "Nor is the main purpose even protection of the small speculator," although protection for the individual investors could be a "byproduct of the main purpose." *Id.* It is clear from the legislative history of Section 7 that Congress intended to limit the amount of credit in market speculation, and any protection this provided for the individual investor was only a "byproduct." Because Section 7 and Section 8 were conceptually related and both function to limit the extension of credit, it is reasonable to infer that Section 8 was enacted with a similar purpose. While the legislative history surrounding Section 7 is not strong evidence of a similar lack of congressional intent to include a private right of action in Section 8, it weighs against implying a private right of action in Section 8.

 "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 365, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (Scalia, J., concurring in part and concurring in the judgment). Only if the statute evinces a clear congressional intent to create a private remedy should the courts imply a private right of action and allow private parties to enforce the statute through civil litigation. *See Sandoval,* 532 U.S. at 286, 121 S.Ct. 1511; *Baggett v. First Nat'l Bank of Gainesville,* 117 F.3d 1342, 1345 (11th Cir. 1997). The text and structure of Section 8 of the Exchange Act lack any rights-creating language that would signal a legislative

intent to create a private right of action on behalf of investors who give control of their securities to brokers, like Plaintiffs here. Further, while the legislative history of Section 8 is silent as to a private right of action, the circumstances surrounding the passage of Section 7 and the Exchange Act in general show Congress was more concerned about stabilizing the securities market, not protecting the individual investor. Because there is no clear evidence of a congressional intent to create a private right of action in Section 8, the Court will decline to imply one. With no private right of action to enforce Section 8 in civil litigation, Defendants' motion to dismiss Count I must be granted, and Count I is dismissed.

### B. Count II—Violations of the Florida Deceptive and Unfair Trade Practices Act

■ Plaintiffs claim that Defendants are liable under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.212, Fla. Stat., because they "[m]isrepresented the outstanding balance and amounts due on monthly statements, payment demands, and notices" associated with their accounts. Further, Plaintiffs claim Defendants engaged in "deceptive and deceitful conduct." Defendants move to dismiss Count II on three grounds: (1) the FDUTPA does not apply to banks; (2) Plaintiffs fail to identify a law, statute, rule, regulation, or ordinance that Defendants have violated; and (3) Plaintiffs lack standing under the FDUTPA because they are not residents of Florida or "in-state consumers."

■ None of the three grounds put forth by Defendants warrant dismissing Plaintiffs' Count II claim under the FDUTPA. First, Plaintiffs argue that the exemption in the FDUTPA for banks does not apply because Defendants were acting as a broker of securities, not as a bank.

See § 501.212(4)(b)-(c), Fla. Stat. It would be premature at the motion to dismiss stage to determine whether Defendants were acting as banks or brokers, and thus, would be exempted from application of the FDUTPA. Second, even if Plaintiffs do not identify a specific law or regulation that Defendants violate, Plaintiffs do allege that Defendants "engaged in deceptive and deceitful conduct" with supporting factual allegations. Because a FDUTPA claim can alternatively allege that the defendant violated the "standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts," § 501.203, Fla. Stat., Plaintiffs have sufficiently pled this element to state a claim upon which relief can be granted. Third, Plaintiffs allege that they utilized millions of dollars of banking and securities services in the State of Florida, which are sufficient allegations that they are "in-state consumers." Plaintiffs' allegations of their Count II FDUTPA claim are sufficient to withstand the motion to dismiss, and Defendants' motion to dismiss Count II is denied.

### C. Count III—Breach of Contract: Count VI—Breach of Duty of Good Faith and Fair Dealing: and Count V—Conversion

■ All three of these counts are contract-based and relate to Defendants' obligations under the documents Plaintiffs signed when they opened the accounts with Defendants. Plaintiffs claim that Defendants breached their contractual obligations and committed conversion by forging debt instruments and freezing access to the money in the accounts. Defendants move to dismiss these three counts on the theory that Plaintiff Larach signed a pledge agreement for Inlaza's loan obligations which authorized them to pledge the money in the Great American accounts as collateral for all of Inlaza's obligations.

Plaintiffs argue the pledge agreement only covered the one loan of $1.5 million to Inlaza for which Plaintiff Larach agreed to pledge Plaintiffs' assets as security. Plaintiffs claim that even under the pledge agreement, Defendants would have had to obtain consent from Plaintiffs to authorize any loans other than the one $1.5 million to Inlaza. The parties' differing interpretations of their respective obligations under the pledge agreement demonstrate that this issue is not ripe for decision at the motion to dismiss stage. Plaintiffs have sufficiently alleged the required elements for claims of breach of contract, breach of duty of good faith and fair dealing, and conversion with supporting factual claims. Therefore, Defendants motion to dismiss these claims is denied, with leave to renew as a motion for summary judgment.

### D. Count VI—Common Law Fraud: Count VII—Breach of Fiduciary Duties: and Count VIII—Negligence/Negligent Servicing

██ Defendants move to dismiss (1) the claim for fraud, arguing that Plaintiffs did not justifiably rely on the alleged misstatements; (2) the claim for breach of a fiduciary duty, arguing that Plaintiffs fail to allege facts to establish that a fiduciary relationship existed; and (3) the claim for negligence, arguing that Defendants acted consistently with their obligations under the Inlaza pledge agreement and did not breach their duty of care. Plaintiffs sufficiently pled the elements of each of these claims. Additionally, Defendants arguments are based on fact-intensive inquiries that are inappropriate for consideration at this stage in the litigation. *See, e.g., Hickman v. Barclay's Int'l Realty, Inc.,* 5 So.3d 804, 806 (Fla. 4th DCA 2009) (stating that "the existence of an agency relationship is a question of fact," that can only be decided as a matter of law when the evidence "is so unequivocal that reasonable persons could reach by one conclusion"). The Court denies the motion to dismiss as to these counts with leave to renew at the summary judgment stage because Plaintiffs' allegations as to these counts "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

## IV. CONCLUSION

THIS CAUSE came before the Court upon Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (**D.E. No. 24**), filed on ***October 5, 2009.*** Plaintiffs' Count I claim for violations of Section 8 of the Securities Exchange Act of 1934 fails to state a claim upon which relief can be granted because there is no private right of action to enforce that section of the securities laws. Plaintiffs' Counts II–VIII, however, sufficiently plead their claims to withstand the motion to dismiss. Therefore, it is

**ADJUDGED** that the motion to dismiss is GRANTED as to Count I of the Second Amended Complaint. Accordingly, Count I is hereby DISMISSED. Further, it is

**ADJUDGED** that the motion to dismiss is DENIED as to Counts II–VIII, with leave to renew as a motion for summary judgment. Finally, it is

**ORDERED** that Defendants shall file an answer to the Second Amended Complaint no later than ***July 19, 2010.***