09-4414-cv
Fezzani v. Bear, Stearns & Co.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued:  April 6, 2011          Decided: May 7, 2013)

Docket No. 09-4414-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MOHAMMED FEZZANI, CIRENACA FOUNDATION, DR. VICTORIA BLANK, LESTER
BLANK, JAMES BAILEY, JANE BAILEY, BAYDEL LTD., MARGARET BURGESS,
PATRICK BURGESS, BOOTLESVILLE TRUST, and ADAM CUNG,
          Plaintiffs-Appellants,


                    v.

BEAR, STEARNS & CO. INC., BEAR STEARNS SECURITIES CORP., RICHARD
HARRITON, MORRIS WOLFSON, ARIELLE WOLFSON, ABRAHAM WOLFSON, TOVIE
WOLFSON, ANDERER ASSOCIATES, BOSTON PARTNERS, WOLFSON EQUITIES,
TURNER SCHARER, CHAN SASHA FOUNDATION, UNITED CONGREGATION
MESERAH, ISAAC DWECK, Individually and as Custodian for NATHAN
DWECK, BARBARA DWECK, MORRIS I. DWECK, RALPH I. DWECK, JACK
DWECK, FAHNESTOCK & CO. INC., BARRY GESSER, MICHAEL REITER, and
APOLLO EQUITIES,
          Defendants-Appellees,

ARTHUR BRESSMAN, ANDREW BRESSMAN, RICHARD ACOSTA, GLENN O'HARE,
JOSEPH SCANNI, BRETT HIRSCH, GARVEY FOX, MATTHEW HIRSCH, RICHARD
SIMONE, CHARLES PLAIA, JOHN MCANDRIS, JACK WOLYNEZ, ROBERT
GILBERT, FIRST HANOVER SECURITIES, INC., BANQUE AUDI SUISSE
GENEVE, FOZIE FARKASH, RAWAI RAES, BASIL SHIBLAQ, IYAD SHIBLAQ,
KEN STOKES, MILLO DWECK, BEATRICE DWECK, RICHARD DWECK, ISAAC B.
DWECK, HANK DWECK, and DONALD & CO.,
          Defendants.[*]

- - - - - - - - - - - - - - - - - -- - - - - - - - - - - - - - - - -



B e f o r e:   WINTER, CABRANES, and LOHIER, Circuit Judges.

---

[*]The Clerk of Court is directed to amend the caption to read as shown above.

Appeal from a dismissal by the United States District Court for the Southern District of New York (Paul A. Crotty, Judge), of a complaint alleging securities manipulation in violation of Section 10(b).  We affirm in part and vacate and remand in part by opinion with respect to one group of defendants.  We affirm in part and vacate and remand in part by summary order with respect to remaining defendants.

Judge Lohier concurs in part and dissents in part in a separate opinion.

MAX FOLKENFLIK, Folkenflik & McGerity, New York, New York, for Plaintiffs-Appellants.

KERRY A. DZIUBEK (Michael D. Schissel & Jonathan N. Francis, on the brief), Arnold & Porter LLP, New York, New York, for Defendants-Appellees Bear, Stearns & Co. Inc. and Bear Stearns Securities Corp.

HOWARD WILSON (John H. Snyder, on the brief), Proskauer Rose LLP, New York, New York, for Defendant-Appellee Richard Harriton.

DONALD A. CORBETT (Ira Lee Sorkin & Daniel K. Roque, on the brief), Lowenstein Sandler PC, New York, New York, for Defendants-Appellees Morris Wolfson, Arielle Wolfson, Aaron Wolfson, Abraham Wolfson, Tovie Wolfson, Anderer Associates, Boston Partners, Wolfson Equities, Turner Scharer, Chan Sasha Foundation, and United Congregation Meserah.

DONALD N. COHEN (Timothy E. Di Domenico, on the brief), Greenberg Traurig, LLP, New York, New York, for Defendants-Appellees Isaac R. Dweck, Individually and as Custodian for Nathan Dweck, Barbara Dweck, Morris I. Dweck, Ralph I. Dweck, and Jack Dweck.

THOMAS J. QUIGLEY (Christopher J. Paolella, on the brief), Winston & Strawn LLP, New York, New York, for Defendant-Appellee Fahnestock & Co., Inc.

STEPHEN WAGNER, Cohen Tauber Spievack & Wagner P.C., New York, New York, for Defendant-Appellee Michael Reiter.

No appearance by Barry Gesser or Apollo Equities.

WINTER, Circuit Judge:

Several individual investors appeal from Judge Crotty's dismissal of their complaint alleging securities fraud in violation of Section 10(b). We dispose of this appeal by both summary order and opinion. In the summary order issued simultaneously with this opinion, we affirm in part and vacate and remand in part with regard to most appellees. In this opinion, we affirm the dismissal of the federal claim and vacate and remand on the state law claim with regard to one group of appellees, principally Isaac R. Dweck.[1]

---

[1] Isaac R. Dweck is sued individually and as a custodian for Nathan Dweck, Barbara Dweck, Morris I. Dweck, Ralph I. Dweck, and Jack Dweck. Although appellants refer broadly to "the Dwecks," their allegations regarding the Dwecks seem to involve only Isaac R. Dweck.

3

BACKGROUND

This litigation arises out of a fraudulent scheme engaged in by a now-defunct broker-dealer, A.R. Baron ("Baron"). Over the course of four years beginning in 1992, Baron defrauded customers of millions of dollars. As a result, Baron's former officers, directors, and key employees have been convicted of various crimes.

As pertinent here, and based on the complaint, the allegations of which we assume to be true, Baron's scheme used high-pressure sales campaigns involving "cold calls" to potential customers. The goal of the scheme was to induce the customers to purchase securities in initial public offerings of small, unknown companies with negligible profits. The salespeople would falsely represent that the stocks were the subject of an active, rising market, and the purchasers were led to believe that the prices they paid were set by trading in that arms-length market. In fact, the market was principally a series of artificial trades orchestrated by Baron designed to create a false appearance of volume and increasing price. Baron's scheme was a paradigmatic "pump and dump" scheme.

The scheme was in part furthered by "parking" stock with trusted Baron investors, including Dweck. "Parking" would involve placing stock in the investor's account while Baron retained the risk of loss by promising to buy back shares, if necessary, at a price that afforded the insider a guaranteed

4

profit.  Based on Baron's salespeople's false representations of trading volume and increasing stock prices inducing customers to buy, Baron and its co-conspirators would sell their holdings at a profit before the stock crashed.

Appellants do not allege a liquid, efficient market in the securities.  Rather, they allege that the only market for them was based on artificial trading by Baron and others.  <u>See</u> Pls.' First Am. Compl. at 9 ¶ 17 ("[T]here was no real market for [the manipulated securities] outside of Baron, and its customers, and other brokers with whom it conspired.  Because of the limited public information available . . . (few, if any, were followed by other brokerage firm analysts)[,] Baron brokers were able to 'box' the stock.").[2]  Appellants alleged that Baron and Bear Stearns, <u>see</u> <u>infra</u> note 4, falsely represented the securities

---

[2] Doubt has been cast upon the ability of plaintiffs alleging manipulation of securities prices to prove the existence of an actual liquid, efficient market for the securities that have allegedly been manipulated.  <u>See</u> Charles R. Korsmo, <u>Mismatch:  The Misuse of Market Efficiency in Market Manipulation Class Actions</u>, 52 Wm. & Mary L. Rev. 1111, 1114-17, 1171 (2011); <u>see also</u> <u>West v. Prudential Sec., Inc.</u>, 282 F.3d 935 (7th Cir. 2002).  In a liquid, efficient market, current prices are publicly reported in real time. To affect those prices -- say, to create the appearance of a rising demand and price for a particular security -- the manipulator would have to buy all the shares offered by the tens of thousands, if not millions, of traders wanting to sell at the higher price with the manipulators having no hope of finding buyers at that higher price.  The "pumping" would thus be enormously expensive and the "dumping" impossible.  Because proving reliance in schemes like Baron's, involving salespeoples' false representations of a market, is not a serious problem, the implications of these insights relate principally to class actions.  There may thus be some merit to a modified presumption of reliance in market manipulation cases because reliance by investors on a misrepresentation of a price as being set by an active, arms-length market may be presumed.  <u>See</u> Korsmo, <u>supra</u>, at 1171.  We leave this issue for consideration by future panels but call to the reader's attention the cited discussions.

were trading in "an active, liquid, bona fide market," see Pls.' First Am. Compl. at 10 ¶ 21, 16 ¶¶ 40-41, and that appellants believed the price at which the securities were offered was that established by that public market rather than an artificial price established by Baron. The deception on which appellants relied, therefore, were statements by Baron's salespeople that the customers were buying at a price set by public market activity.

The complaint alleged that Dweck was one of Baron's principal investors, provided Baron with short-term cash infusions and financing for specific deals, and allowed Baron to park certain securities on particular occasions in his accounts at other broker-dealers. Dweck was rewarded with ownership in companies on a preferential basis and a guaranteed return on his parking arrangements as well. These acts undoubtedly facilitated Baron's frauds. The impact of Dweck's involvement is alleged to have been twofold. Parking by Dweck and others "creat[ed] a false impression in the minds of Baron customers of the value and liquidity of the 'parked' securities and induced Baron customers . . . to make investments based on Baron's illusion of trading activity," id. at 44 ¶ 131, while Dweck's provision of funds to Baron prolonged the firm's frauds. See id. at 18 ¶ 46 (noting the importance of collective action for the fraud to succeed); see also id. at 81 ¶ 251.

However, appellants' claims for damages do not contain discrete claims related to the prices paid for the particular

6

securities parked by Dweck at times they were trading.  Rather, they seek to recover damages for all losses caused by Baron. While the complaint contains voluminous records of trades involving securities of various firms over extended periods of time, no attempt is made to connect particular trades in particular securities to Dweck's parking.

DISCUSSION

As noted with regard to Dweck, the only legal claims in the complaint argued on this appeal are that:  (i) his conduct involved market manipulation in violation of Section 10(b) and Rule 10b-5; and (ii) he aided and abetted, and conspired to commit, fraud under New York law.  Also, appellants make no claim for recovery from Dweck for damages caused by parking particular securities but seek, like our dissenting colleague, to impose liability on Dweck for all of Baron's deceptive activities.

We review <u>de novo</u> a district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6). <u>Selevan v. N.Y. Thruway Auth.</u>, 584 F.3d 82, 88 (2d Cir. 2009). "In conducting this review, we assume all 'well-pleaded factual allegations' to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'"  <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009)).  A complaint alleging securities fraud in a private action for damages is subject to heightened pleadings standards.  First, it must satisfy Rule 9(b), which requires that "a party must state with particularity

the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Second, under the pleading standards of the Private Securities Litigation Reform Act, codified at 15 U.S.C. § 78u-4(b), the allegations of the state of mind required for a Section 10(b) violation -- scienter or recklessness, <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 168-69 (2d Cir. 2000) -- must state "facts [either] (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007).

Valid securities-manipulation claims under Section 10(b) must allege:  "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."  <u>Id.</u> at 101.  These elements -- save for the requirement of manipulative acts and a misplaced belief in the price of the security as being set by arms-length, <u>bona fide</u> trading[3] -- are, of course, identical to Section 10(b) claims generally.  <u>See</u>

---

[3] We do not read <u>ATSI</u>'s reference to "reliance on an assumption of an efficient market free of manipulation" as referring to a liquid, efficient market with prices publicly reported in real time.  We read <u>ATSI</u>'s reference to an "efficient" market to mean only a <u>bona</u> <u>fide</u> "market free of manipulation."  493 F.3d at 101; <u>see</u> <u>also</u> <u>supra</u> note 2.

8

Stoneridge Inv. Partners, L.L.C. v. Scientific-Atlanta, 552 U.S. 148, 156-57 (2008) (noting that the typical § 10(b) claim must make the same allegations).

There is no doubt that appellants have alleged a valid Section 10(b) claim against Baron based on false representations that the price Baron charged customers for securities was established in a market independent of artificial trading by Baron itself. They have also adequately alleged their reliance upon Baron's misrepresentations.

Our difficulty with regard to Dweck's liability under Section 10(b) arises from the lack of an allegation that Dweck was involved in any communication with any of the appellants. Dweck is alleged to have been one of a group that engaged in phony trading activity that created an "impression" of "value and liquidity" in securities being pedaled by Baron. There is no allegation that any appellant was told of Dweck's artificial trading, or purchased such securities in specific reliance on such trading. See Pls.' First Am. Compl. at 18 ¶ 46 (noting the importance of collective action for perpetrating the fraud); see also id. at 107 ¶ 332 (alleging reliance on defendants collectively and not individually). Baron and Bear Stearns[4] are

_____

[4] Bear Stearns' role in reporting the prices of Baron securities is unclear in the allegations of the complaint. The complaint states that Bear Stearns, acting as a clearing broker for Baron, sent confirmations of transactions, which may have contained information as to the prices paid by the particular investor. See Pls.' First Am. Compl. at 16-17 ¶ 42. Because confirmations came after trades were made, the price information was the result, not the cause, of the fraud. Plaintiffs also allege that Bear Stearns

9

the sole sources alleged regarding the appellants' perceptions of prices at which trades were being made.

Dweck is sufficiently alleged to have had particular knowledge of some artificial trades, to have participated in them, and to have actively facilitated Baron's fraudulent business generally by loans and other investments. The issue is whether, as appellants argue and our dissenting colleague agrees, these allegations sufficiently support a Section 10(b) claim for damages by all the appellants for all the fraudulent sales of securities to them by Baron.

In pursuing a claim against Dweck for all damages caused by Baron, appellants make no claim of Dweck's liability under respondeat superior or other common law theory of vicarious liability. They have also abandoned any claim on appeal that Dweck is liable under Section 20(a) as a "controlling person" –– any "person who, directly or indirectly, controls any person liable under [the '34 Act]" is "liable jointly and severally" for the violation, 15 U.S.C. § 78t(a) –– with regard to Baron's fraud. And, they have dropped all claims based on Section 9 of the '34 Act. 15 U.S.C. § 78i (prohibiting "any transaction"

---

issued monthly statements to investors, which may have contained information as to current value based on share price. Id. The values reported, if reported, in the monthly statements, would have been derived from reports of traders by the brokers used by the manipulators, in Dweck's case, Fahnestock & Co, Inc. See id. at 59-60 ¶ 178 (suggesting that brokers book trades on behalf of their clients); id. at 44 ¶ 130 (stating that Baron was responsible for booking the parking transactions and placing shares in customer account).

effected for "the purpose of creating a false or misleading appearance of active trading in any security . . . or a false or misleading appearance with respect to the market for any such security").[5]

Therefore, because there is no aiding and abetting liability in <u>private</u> actions under Section 10(b), Dweck may be liable in this matter only as a primary violator. <u>Cent. Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 180, 191 (1994). The Supreme Court has held that to prove a primary violation of Section 10(b), in such a private action, a plaintiff must allege that the specific defendant was identified as making the pertinent misrepresentation(s). <u>Stoneridge</u>, 552 U.S. at 158-59. Otherwise, the plaintiff's complaint would fail to allege reliance upon a misrepresentation made by that defendant, an element of a valid Section 10(b) claim for damages caused by a primary violator of that section. In short, an allegation of acts facilitating or even indispensable to a fraud is not sufficient to state a claim if those acts were not the particular

_____

[5] At the time this action was filed, and indeed for much of the period during which it has been litigated, Section 9 of the Securities and Exchange Act prohibited, and provided a remedy for those who were injured as a result of, certain manipulative conduct in the trading of securities traded on "national securities exchanges." <u>See, e.g.</u>, 15 U.S.C. § 78i(2006). Plaintiffs' Section 9 claim, asserted in a prior iteration of the complaint, was dismissed by the district court as a result of that particular then in-force limitation. <u>See</u> <u>Fezzani v. Bear, Stearns & Co.</u>, 384 F. Supp. 2d 618, 641 (S.D.N.Y. 2004). The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376, significantly amended Section 9 by, among other changes, removing the "registered on a national securities exchange" limitation. Section 9, on its face, now covers manipulative conduct in the trading of most securities.

misrepresentations that deceived the investor. See, e.g., id. at 157-59.

For example, in Stoneridge, the defendant, Scientific-Atlanta, had knowingly structured a sale of cable boxes to Charter at an artificially high price. Id. at 154. At the end of the year, Scientific-Atlanta returned the excess portion of the price by purchasing advertising from Charter at above-market prices. Id. at 154-55. This was alleged to have been a phony transaction designed only to allow Charter to report the returned excess as a purchase of advertising by Scientific-Atlanta, thus inflating Charter's revenue, and then to capitalize the inflated costs of the cable boxes, thereby decreasing Charter's apparent operating costs. Id. Although the complaint in Stoneridge alleged that the transactions had no economic substance and were specifically intended by Scientific-Atlanta to deceive investors (and Charter's auditor) -- precisely as appellants have alleged with regard to Dweck's acts -- the Supreme Court held that Scientific-Atlanta could not be liable in a civil action for damages under Section 10(b). Id. at 154-55, 166-67. The ground for this holding was that only Charter, and not Scientific-Atlanta, had made the fraudulent statements to the public through its financial statements. Id. at 155, 166-67.

The Supreme Court further elaborated this test in Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. __, 131 S. Ct. 2296 (2011). In Janus, the Court held that a corporation

12

serving as the investment advisor and administrator -- the manager -- of a mutual fund could not be liable under Section 10(b) for false statements made in the mutual fund's prospectuses. Id. at 2299, 2305. The Court held that the advisor/administrator was insulated from Section 10(b) civil liability because the false statements to the public were made only in the name of the mutual fund, a separate corporate entity. Id. at 2305. Given that the advisor/administrator, as the Fund's manager, had surely prepared the prospectuses, Dweck's more limited involvement in Baron's frauds, although serious, is foreclosed by Janus (and Stoneridge as well).

Applying these principles to the present claims, appellants were required to allege acts by Dweck that amounted to more than knowingly participating in, or facilitating, Baron's fraud to state a claim under Section 10(b). To reiterate, under ATSI, manipulation violates Section 10(b) when an artificial or phony price of a security is communicated to persons who, in reliance upon a misrepresentation that the price was set by market forces, purchase the securities. 493 F.3d at 101-02. Under Stoneridge, 552 U.S. at 159-60, 166-67, and Janus, 131 S. Ct. at 2305, only the person who communicates the misrepresentation is liable in private actions under Section 10(b). The present complaint alleges only that Baron and Bear Stearns communicated the artificial price information to the would-be buyers. Therefore, allegations of financing Baron's operations and parking some

13

securities fail to state a Section 10(b) <u>private claim for damages</u> against Dweck.

To summarize, appellants have sufficiently pleaded with particularity that Dweck provided knowing and substantial assistance in financing and facilitating the Baron fraud. While such allegations would easily be sufficient in an SEC civil action, <u>see</u> 15 U.S.C. § 78t(e), or a federal criminal action because this knowing and substantial assistance constitutes, at the least, aiding and abetting, <u>see</u> 18 U.S.C. § 2, they do not meet the standards for private damage actions under Section 10(b).

Nevertheless, with regard to appellants' state law claims -- civil conspiracy to defraud and aiding and abetting fraud -- the complaint alleges sufficient involvement by Dweck in the scheme to survive a motion to dismiss. Therefore, we vacate the dismissal and remand appellants' state law claims against Dweck for further proceedings.[6]

                              CONCLUSION

We therefore affirm the district court's dismissal of appellants' federal securities claims against Dweck and vacate and remand the state law claims.

---

[6] It is appropriate for the district court to retain jurisdiction over these state claims for the reasons expressed in its earlier opinion, that is, because these state law claims arose out of the same set of facts as the federal claims. <u>See</u> <u>Fezzani v. Bear, Stearns & Co.</u>, 592 F. Supp. 2d 410, 429-30 (S.D.N.Y. 2008).

LOHIER, Circuit Judge, concurring in part and dissenting in part:

Although I agree with the majority's resolution of the state-law fraud claims against Isaac Dweck ("Dweck"), I respectfully dissent from the majority's disposition of the federal securities claim of market manipulation against Dweck. In my view, the plaintiffs sufficiently pleaded such a claim by alleging that (1) Dweck participated in a manipulative scheme in which he conveyed to the investing public, through a series of securities transactions, false signals that he controlled securities that were in fact controlled by a boiler room, A.R. Baron ("Baron"), (2) these false signals distorted the market for the relevant securities, and (3) they relied on an assumption of an efficient market free of manipulation in buying the relevant securities.

The majority opinion takes at least three wrong turns as it navigates the complaint and the relevant legal landscape. First, it ignores the fact that Dweck is alleged to be an insider of Baron who has primary liability under Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, for engaging in a manipulative scheme. Instead, it interprets the complaint to state a claim only for aiding and abetting securities fraud. Second, it conflates market manipulation claims and pure misrepresentation claims. Third, it misreads Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), and Stoneridge Investment Partners, LLC v. Scientific-Atlanta, 552 U.S. 148 (2008), to require a direct communication of false information to the plaintiffs in the context of a claim of market manipulation.

As the Supreme Court explained in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,

> [t]he absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device

> _or_ makes a material misstatement (or omission) on which a
> purchaser or seller of securities relies _may be liable as a primary_
> _violator_ under 10b-5.

511 U.S. 164, 191 (1994) (emphasis added).  The Court in <u>Central Bank</u> also highlighted the

distinction between "those who do not engage in the manipulative or deceptive practice," and

those "who aid and abet the violation."  <u>Id.</u> at 167.  "[A]iding and abetting liability reaches

persons who do not engage in the proscribed activities at all, but who give a degree of aid to

those who do."  <u>Id.</u> at 176.  In other words, secondary actors who do more than aid and abet a

securities fraud can be liable as primary violators.  Neither the Supreme Court nor our precedents

have modified the principle that an individual who "commi[tted] a manipulative act" and thereby

"participated in a fraudulent scheme" is a primary violator.  <u>SEC v. U.S. Envtl., Inc.</u>, 155 F.3d

107, 112 (2d Cir. 1998).

Here, the plaintiffs claim that Dweck was a primary violator because he engaged directly

in market manipulation.  The Supreme Court has described market manipulation as a "term of

art" in connection with securities markets that generally refers "to practices, such as wash sales,

matched orders, or rigged prices, that are intended to mislead investors by artificially affecting

market activity."  <u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. 462, 476 (1977).  As I describe in

greater detail below, the first amended complaint alleges that Dweck engaged in at least some of

these manipulative practices directly.

The majority opinion itself aptly describes the purpose of the scheme involving Dweck

and others as follows: "[T]he market was principally a series of artificial trades orchestrated by

Baron designed to create a false appearance of volume and of increasing price" so that "Baron

and its co-conspirators [c]ould sell their holdings at a profit before the stock crashed."  Majority

Op. at [4-5].  It required at least two bad actors to create the "false appearance" to the market described in the majority opinion, and Dweck is adequately alleged to be one of those actors engaged in the securities transactions at issue.  See Stoneridge, 552 U.S. at 161.  Indeed, Dweck is specifically alleged to have "authorized," "engaged in" and "agreed to" the scheme, and one can plausibly conclude that, far from being a mere third-party agent or an enabler providing aid from the sidelines, he was central to the manipulation itself.  See, e.g., J.A. at 320 ("As one of the founding investors and principal owners of A.R. Baron, Dweck played an important role in Baron's operations.  He provided substantial needed bridge financing for many of the Baron investments . . . .").

To the extent that the majority opinion superimposes the elements of a misrepresentation claim on a market manipulation claim and suggests that misrepresentation and market manipulation claims should be analyzed identically in this case, I respectfully disagree.  Although both claims fall within the scope of conduct generally prohibited by Section 10(b), the pleading requirements for a claim of market manipulation differ from the pleading requirements for a misrepresentation claim.  "Market manipulation requires a plaintiff to allege (1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."  ATSI Commc'n, Inc. v. Shaar Fund, Ltd, 493 F.3d 87, 101 (2d Cir. 2007); Wilson v. Merrill Lynch & Co., Inc., 671 F.3d 120, 129 (2d Cir. 2011).  A misrepresentation claim, on the other hand, requires the plaintiff to allege "(1) a material representation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale

3

of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge, 552 U.S. at 157; Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP, 603 F.3d 114, 151 (2d Cir. 2010).

The most relevant difference between the two claims relates to pleading reliance. A market manipulation claim permits the plaintiff to plead that it relied on an assumption of an efficient market free of manipulation, whereas a misrepresentation claim requires the plaintiff to allege reliance upon a misrepresentation or omission. Compare ATSI, 493 F.3d at 101, with Stoneridge, 552 U.S. at 157. In addition, "a claim of manipulation . . . can involve facts solely within the defendant's knowledge; therefore, . . . the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." ATSI, 493 F.3d at 102.

These differences, among others, between claims based on market manipulation and those based on misrepresentation are essential to understanding why the Supreme Court's analysis in Stoneridge and Janus regarding reliance does not control the outcome in this case, and why the majority opinion is wrong to conclude that these cases foreclose the market manipulation claim against Dweck.

Our Court has recognized that the fraud-on-the-market doctrine "creates a presumption that (1) misrepresentations by an issuer affect the market price of securities traded in an open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 483 (2d Cir. 2008) (emphasis in original). In a Section 10(b) misrepresentation claim premised on the fraud-on-the-market theory, it is the misrepresentation that affects the market price of securities. Id. In comparison, participants in market manipulation schemes engage in fraudulent transactions in

4

the public market for securities. The market manipulators' "own deceptive conduct," Stoneridge, 552 U.S. at 160, affects the market price of securities traded in the market,[1] ATSI, 493 F.3d at 101 (market manipulation requires "market activity" that "create[s] a false impression of how market participants value a security"). For this reason, in a market manipulation claim based on a fraud-on-the-market theory, the complaint must allege that the manipulative acts of each principal participant in the scheme communicate false pricing signals to the market, which in turn transmits the false pricing information to investors. See Basic Inc. v. Levinson, 485 U.S. 224, 244 (1988) (describing theory of reliance based on fraud-on-the-market theory and explaining that "[w]ith the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of market price"). The relevant analysis, therefore, is whether a defendant has engaged in a manipulative "transaction [that] sends a false pricing signal to the market," ATSI, 493 F.3d at 100, or "convey[s] a misleading impression" to the investing public, United States v. Finnerty, 533 F.3d 143, 149 (2d Cir. 2008). If so, we presume that the market acts as the intermediary in communicating that false signal or conveying that false impression to investors.

With these principles in mind, I conclude that permitting the plaintiffs to proceed with their claim against Dweck by pleading reliance based on these false communications to the market is entirely consistent with the holdings in Stoneridge and Janus, neither of which disavows a theory of reliance based on the fraud-on-the-market doctrine. See Stoneridge, 552

---

[1] If true, the allegations relating to Dweck describe a classic market manipulator. As the majority opinion acknowledges, he is alleged to have participated in prearranged stock transactions with no risk of loss that were completed for the sole purpose of artificially increasing the trading volume and the prices of the manipulated securities. Majority Op. at [10].

5

U.S. at 159 ("[U]nder the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement." (citing Basic, 485 U.S. at 247)); In re Salomon Analyst Metromedia Litig., 544 F.3d at 481. In Stoneridge, the Supreme Court affirmed the trial court's dismissal of a claim alleging a fraudulent scheme because the defendants' "deceptive acts were not communicated to the public. No member of the investing public had knowledge, either actual or presumed, of [defendants'] deceptive acts during the relevant times." 552 U.S. at 159. Moreover, the scheme in Stoneridge involved potentially fraudulent transactions "in the marketplace for goods and services, not," as with Dweck's alleged market manipulation, "in the investment sphere." Id. at 166. Janus, too, involved discrete misrepresentations relating to the defendants' business operations, rather than a market manipulation scheme such as the one alleged here. Specifically, the plaintiffs in Janus alleged that certain mutual fund prospectuses included fraudulent misrepresentations indicating that the funds "were not suitable for market timing" and would avoid that practice. 131 S. Ct. at 2300.

According to the majority opinion, Stoneridge held that "a plaintiff must allege that the specific defendant was identified as making the pertinent misrepresentation(s)." Majority Op. at [11] (citing Stoneridge, 552 U.S. at 158-59). Stoneridge, of course, did no such thing. Ultimately, the claims in both Stoneridge and Janus failed because the defendants in each case did not communicate any false statement or misrepresentation directly to the investing public, and the "deceptive acts" of the defendants in Stoneridge were "too remote to satisfy the requirement of reliance." Stoneridge, 552 U.S. at 161. Stock manipulation, however, necessarily and directly communicates false information through the market and goes beyond a

6

false statement. See ATSI, 493 F.3d at 101 (market manipulation requires "market activity" that "create[s] a false impression of how market participants value a security"); GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 207 (3d Cir. 2001) (identifying manipulative conduct as transactions that "inject[] false inaccurate information into the marketplace or create[] a false impression of supply and demand").

I have not been able to find a single federal case that has applied Stoneridge or Janus to foreclose a claim against an actor alleged to have engaged directly in market manipulation of securities. Yet, relying on Stoneridge and Janus, the majority opinion does so by mistakenly focusing on who actually communicated the false price to the plaintiffs and viewing the answer to that question as dispositive. See Majority Op. at [14] ("The present complaint alleges only that Baron and Bear Stearns communicated the artificial price information to the would-be buyers"). In doing so, however, the majority opinion ignores the fraud-on-the-market doctrine—a doctrine that, as I have explained, clearly remains a viable method for establishing reliance after Stoneridge and Janus—and wrongly suggests that Stoneridge and Janus require a direct communication of either a false statement or deceptive conduct to specific plaintiffs in every case in order for those plaintiffs to state a claim under Section 10(b) or Rule 10b-5. Cf. U.S. SEC v. Landberg, No. 11 Civ. 0404, 2011 WL 5116512, at *4 (S.D.N.Y. Oct. 26, 2011) (concluding that Janus does not require dismissal of a complaint that "plausibly alleges that [the defendant] violated Rule 10b-5 beyond the making of a statement" by participating in a manipulative scheme).

The plaintiffs have pleaded a market manipulation claim against Dweck based on a theory of reliance that both Stoneridge and Janus appear to embrace. In their first amended complaint, plaintiffs allege that Dweck effectively was a founder, principal, and owner of Baron,

7

which was indisputably an archetypal boiler room.[2] They also allege that Dweck was a key participant in the manipulative scheme who actively engaged in several prearranged, riskless trades, among other things, that resulted in his purchase of securities (warrants) pursuant to an agreement with Baron. There is no question that the prearranged securities trades were illegal. Moreover, as alleged, they were designed to deceive by directly giving the public the false impression that Dweck, not Baron, controlled the relevant manipulated securities.

The first amended complaint also explains the impact that the Baron/Dweck manipulative scheme had on the market and on the plaintiffs:

> 6. . . . During all times relevant hereto, defendants . . . initiated and/or joined in a course of conduct that was designed to and did, (a) manipulate and artificially inflate the market prices of the Manipulated Securities in excess of their market price during the relevant period; (b) deceive the investing public, including, in particular, plaintiffs, regarding the fundamental attributes, market prices and future prospects of the Manipulated Securities; (c) cause plaintiffs to purchase the Manipulated Securities at manipulated and artificially inflated prices; and (d) thereby caused plaintiffs damage.
>
> 10. Defendant[] Isaac R. Dweck . . . also engaged in parking transactions with the purpose and effect of creating a false appearance of an active trading market with the intent of inflating the trading price of the Manipulated Securities and causing investors, such as plaintiffs to purchase the Manipulated Securities.
>
> 21. The various fraudulent techniques were designed to, and did, create a price "mirage" which deceived Baron customers into believing that the securities were trading in an active, liquid, *bona fide* market, and to inflate the market price of the Manipulated Securities. Baron then used those inflated prices to fraudulently convince customers to make further purchases.

---

[2] Indeed, A.R. Baron's reputation as an illegal boiler room is well established. See David E. Y. Sarna, History of Greed: Financial Fraud from Tulip Mania to Bernie Madoff 315 (2010).

131. Parking misled regulators and customers about the amount of Baron Stocks in Baron's own inventory, and fictitiously improved Baron's net capital . . . . The placement of such stock also artificially maintained the price of the Manipulated Stocks. The "parking" was done with the purpose and had the effect of creating a false impression in the minds of Baron customers of the value and liquidity of the "parked" securities and induced Baron customers, including plaintiffs, to make investments based on Baron's illusion of trading activity.

293. . . . [E]ach of the Plaintiffs relied [sic] the belief that they were transacting business in a bona fide active, liquid securities market, rather than an illiquid, manipulated and fraudulent market.

319. . . . Defendants' fraudulent and manipulative activities as described herein created the appearance that the price at which the Manipulated Securities traded reflected *bona fide* supply and demand in a freely functioning market. The increasing prices of the Manipulated Securities appeared to indicate increasing value, placed by the market, on the business underlying the securities. Thus, . . . the appearance of an active, rising market induced plaintiffs to purchase those securities in reliance upon the "wisdom of the marketplace."

J.A. at 241, 243, 247, 281, 331, 340 (emphasis added).

I agree that the plaintiffs could have done a better job of drafting the complaint. But that is neither the standard of review nor the standard for a motion to dismiss. The plaintiffs have adequately and plausibly alleged that Dweck personally engaged in a stock manipulation scheme that affected the prices of the relevant manipulated securities. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (describing requirement of "facial plausibility"). As alleged, Dweck's conduct constitutes more than "aid" or "facilitation"; under any fair reading of the complaint, Dweck was up to his eyeballs in the fraud at its inception. The plaintiffs have also adequately and plausibly alleged that they acted in reliance on an assumption of an efficient market free of manipulation when they purchased the securities at artificially inflated prices. In the context of a claim for market manipulation, and at this stage in the proceedings, these allegations are enough. See

9

ATSI, 493 F.3d at 101 (an allegation that the plaintiffs' injuries were "caused by reliance on an assumption of an efficient market free of manipulation" will suffice to establish causation).

Notwithstanding the availability of criminal penalties and civil enforcement by the Securities and Exchange Commission, see Majority Op. at [14], I fear that every market manipulator—the remaining Dwecks of the world—will be cheered by the extra shelter for stock manipulation under the federal securities laws that the majority opinion unnecessarily provides them. If I thought that Stoneridge or Janus required that result, I would shrug, concur, and move on. Because I conclude that neither case forecloses the federal claim of market manipulation against Dweck, I respectfully dissent.